IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JUANA DOE I et al., § <br> § <br> Plaintiffs, § <br> § <br> vs. § <br> § <br> INTERNATIONAL FINANCE § <br> CORPORATION, and IFC ASSET § <br> MANAGEMENT COMPANY, LLC, § <br> § <br> Defendants. § | C.A. No. 17-1494-JFB-SRF <br><br> **Declaration of Marissa Vahlsing in Support of Motion for Preliminary Approval of Proposed Class Settlement** |

I, Marissa Vahlsing, declare the following:

1. I am a Supervising Attorney with EarthRights International and counsel for Plaintiffs in the above-captioned matter. The facts herein are based on my personal knowledge, my review of EarthRights' files, knowledge of facts generally known in Honduras, or public records as cited.

2. I have reviewed the documents identified herein and am fully familiar with the facts set forth therein.

3. A true and correct copy of the executed "Joint Stipulation of Class Action Settlement and Release," which itself contains its own exhibits, is attached hereto as Exhibit 1. Attached to the Joint Stipulation of Class Action Settlement and Release are true and correct copies of the following Exhibits:

- Exhibit A: [Proposed] Distribution Plan for the Individual Plaintiffs' Escrow Account and the Social Benefit Escrow Account

- Exhibit B: [Proposed] Consultation and Implementation Plan for Qualified

       Community Support

- Exhibit C: [Proposed] Identification, Notice, and Opt-Out Plan
    - Exhibit C-1: Proposed Notice Form for Panamá Class
    - Exhibit C-2: Proposed Notice Form for Farmers' Cooperative Class
- Exhibit D: Escrow Agreement
- Exhibit E: [Proposed] Order of Preliminary Approval
- Exhibit F: Public Statements Agreed to by the Parties

4. Counsel for Plaintiffs have shared the Motion for Preliminary Approval of Proposed Class Settlement to Counsel for Defendants, who stated that they do not oppose it.

**Factual Background**

5. The named individual Plaintiffs, class representatives and class members are small-scale farmers and their families in the Bajo Aguán valley region of Honduras who were victims of violence, loss of farmland and psychological abuse. Plaintiffs contend that their injuries were the result of Defendants' financial and other support for a controversial Honduran palm oil company, Dinant, seeking to dispossess Plaintiffs of their lands or maintain control over land already taken from them.

6. Sixteen Plaintiffs are named in the operative First Amended Complaint (DI #38). One of them, Juan Doe XIV, has elected to dismiss his claims with prejudice. Of the remainder, thirteen of them are suing for their own injuries and on behalf of deceased and minor family members ("Individual Plaintiffs"). The other two are

proposed as class representatives: Juan Doe XIII as a representative of approximately 1,100 current and former residents of the community of Panamá, Honduras (the "Panamá Class"), and Juan Doe XVII as a representative of approximately 950 members of farmers' cooperatives in the Bajo Aguán valley (the "Farmers' Cooperative Class"). One of the Individual Plaintiffs, Juan Doe IX, was listed in the Amended Complaint as an additional class representative for the Panamá Class, but is no longer proposed as a class representative.

7. The Individual Plaintiffs include seven named plaintiffs bringing claims arising out of violent death (including torture preceding death), three named plaintiffs who allege that they were shot and continue to suffer lasting bodily injuries, and several other plaintiffs who allege other serious physical and psychological abuse due to consistent harassment by Dinant and its security forces during the time Defendants financially supported and backed Dinant.

8. Plaintiffs contend that, during the class period, Dinant effectively occupied the village of Panamá and terrorized all its inhabitants. They contend that Dinant subjected Panamá – and its roughly 1100 residents – to the same pattern of psychological and physical violence, based on a plan to terrorize the community to force its members to cease efforts to obtain justice for assassinated community leaders and reclaim stolen lands. The community of Panamá is enclosed on three sides by Dinant's operations, the land for which was allegedly acquired through fraud, intimidation, and trickery that community members have frequently contested.

9. The Plaintiffs allege that, during the relevant period of Defendants' support, Dinant's security forces trespassed onto Panamá villagers' lands and invaded their homes, brandished or fired off weapons in the direction of villagers or their homes, threatened villagers' lives, attacked villagers with rubber bullets, teargas, and/or blunt instruments, detained, kidnapped, or abducted villagers and violently caused their death, even maintaining a clandestine graveyard on the property abutting the village. Dinant thus engaged in a single course of conduct: targeting Panamá as a community.

10. Based on a review of public records, existing community surveys, and family interviews, Plaintiffs' attorneys estimate that the Panamá Class consists of around 1,100 people.

11. The Panamá class is represented by Juan Doe XIII, who, like the entire community of Panamá, has faced Dinant's campaign of terror. Plaintiff Juan Doe XIII and his extended family reside or have resided in Panamá adjacent to a Dinant farm. He is a member of a farmers' group that has contested Dinant's claims to disputed land.

12. Juan Doe XIII alleges that, in 2014, after Defendants provided key financing and support to Dinant, he participated in a peaceful protest outside a Dinant farm (adjacent to the village of Panamá) in which neither he nor any of the other protestors were armed. Dinant security personnel, using multiple vehicles and tanks, chased the protestors into the community of Panamá, shot at them, and invaded their homes.

13. Juan Doe XIII also alleges that, in addition to being placed in danger of imminent harm due to these actions, he was arrested, spent a night in prison, and was charged with "encroachment." John Doe XIII is also the brother of decedent John Doe XV, and alleges that John Doe XV was tortured and killed by Dinant's security personnel while unarmed, while Dinant received financial support and backing from Defendants. John Doe XIII alleges that Dinant's security personnel hid John Doe XV's body on a Dinant farm.

14. The claims of Juan Doe XIII, the Panamá Class representative, are typical of the claims of the Class because they arise from the same course of conduct by Defendants, the representative and the Class were all injured as part of the same alleged Dinant campaign of terror against Panamá, and they all suffered the same sorts of injuries. Since the representative and the Class all seek relief from Defendants for precisely the same conduct, under the same law, and Defendants' conduct was not differentiated with respect to individual class members, the representative's claims are typical.

15. Juan Doe XIII also alleges that he was injured as part of the same Dinant campaign of terror against Panamá that injured other class members, as he was chased and shot at by Dinant's security personnel while peacefully protesting Dinant's actions. Juan Doe XIII alleges that he suffered the same emotional distress and trauma from Dinant's campaign of terror as the class as a whole.

16. Juan Doe XIII also alleges additional, distinct injuries. But that too is typical of class members; while the class itself only covers the generalized trauma common

to all class members, numerous members of the Panamá community also suffered distinct harms on top of their class injuries. I have spoken with many members of the Panamá community, and have also received reports of these injuries from others familiar with the community. Thus, Juan Doe XIII's interests are not in any way distinct from that of the other Panamá Class members.

17. The Farmers' Cooperative Class (also referred to as the Unjust Enrichment Class) is composed of about 950 former members of rural cooperatives in the Bajo Aguán region of Honduras, who allege that, since 1992, Dinant has taken their land through violence, intimidation, and fraud. The rural cooperatives (and their members) who were victims of this dispossession include: 9 de Agosto, Concepción, Isla 1, Isla 2, Marañones, Lempira, Occidental, Paso Aguán, Laureles, San Isidrio, Aurora, Confianza, Camarones, Chile, Tranvio, Brisas del Aguán, Panamás, Plantel, and Tumbador farms. Class members are former members of these cooperatives whose land was acquired by Dinant; they allege that this acquisition was unlawful, and that it unjustly enriched Dinant and, ultimately, Defendants.

18. Due to the dispossession of their farmland, cooperative members were deprived of the true value of their share in the ownership of the land and of all the other benefits that share had provided. Dinant's alleged conduct in usurping land was also common to large portions of the class. Indeed, I am aware that Dinant's pattern of land theft has been and can be demonstrated by subsequent court rulings and investigative findings in Honduras. Multiple cooperatives that suffered from this same course of conduct, including: 9 de Agosto, Concepción, Isla 1, Isla 2,

Marañones, Lempira, Occidental, Paso Aguán, Laureles, San Isidrio, Aurora, Confianza, Camarones, Chile, Tranvio, Brisas del Aguán, Panamás, Plantel, and Tumbador farms. Plaintiffs allege that Dinant profited from the production of palm oil on most of the farms, and the benefits accrued to Defendants via interest payments on their loans.

19. Farmers' Cooperative Class members contend that the Defendants were unjustly enriched at the Class members' expense in a number of ways:

   a. Dinant's ability to repay the Defendants' loans with interest was based on Dinant's original impoverishment of the Plaintiffs – namely, Dinant's dispossession of rural cooperative land.

   b. Defendants' financing enabled Dinant to hire security guards and pay bribes to perpetuate their seizure of Plaintiffs' land beginning in 2009, in the face of a mobilization of rural cooperative owners who undertook legal action and advocacy to regain their stolen land.

   c. The security guards and bribes allowed Dinant to coerce cooperatives into repurchasing some of their land at inflated prices. By helping Dinant to unjustly deprive the Plaintiffs of their chance to regain their land and force the repurchase of lands at scandalous prices, the Defendants helped to assure that they would profit from the repayment of their loans.

20. Membership in the Farmers' Cooperative Class can be shown through public records in Honduras, including files held by Honduras's National Agrarian

Institute, the Registrador Nacional de Cooperativas, known by its Spanish initials, CONSUCOOP, and local Honduran courts where proceedings challenging the fraudulent land transfers have been instituted or heard. I am familiar with some of the cooperative members, and so this information can be supplemented with internal documents from rural cooperatives, and interviews with known members.

21. While a precise estimate of Defendants' unjust enrichment is not possible to calculate without discovery, EarthRights has estimated that Defendant International Finance Corporation's (IFC's) enrichment from its US $15 million loan to Dinant is approximately US $4.18 million. This assumes a 10-year repayment with fixed, bi-annual repayment of principal, with interest calculated as 6-month LIBOR plus a spread of 2%. While Plaintiffs do not know the precise terms of IFC's loans here, these contract terms were taken from a similar IFC loan agreement.

22. Plaintiffs believe that Defendants were also enriched through other means, including loans and equity investments in the Honduran bank Ficohsa which itself profited heavily from Dinant's activities. Nonetheless, Plaintiffs do not currently have access to information which would quantify the amount of enrichment from these investments.

23. These farms could have generated significant income for class members over the years that they have been held by Dinant. Yet, the estimated enrichment figure of US $4.18 million spread across the nearly 1,000 estimated members of the Farmers' Cooperative Class, amounts to little more than $4,000 per class member.

Compared to the losses suffered by these class members – loss of their land and years of farming income – this number is significantly less than each could be awarded to them if they sued Defendants individually. The class mechanism is thus the best option for the class members to have a fair recovery, given the risk of individual judgments impairing others' ability to recover at all because each individual recovery could greatly exceed the $4,000 available on a per-capita basis from the enrichment figure.

24. The claims or defenses of the Farmers' Cooperative Class representative, Juan Doe XVII, are typical of those of the Class. Juan Doe XVII was a member of the Laureles farmers' cooperative in the Bajo Aguán in the 1990s when he alleges that he was deprived of his ownership interest in the cooperative by Dinant's late owner, Miguel Facussé, through fraud and coercion.

25. Since that time, Dinant has controlled and used the land in which Juan Doe XVII had an ownership interest for its own gain and profit and has unjustly enriched IFC and IFC Asset Management Company through repayment of their loans with interest. Recently, the Laureles cooperative was able to obtain legal documentation that demonstrates that the land has always belonged to the cooperative, despite Dinant's claims to the contrary. Juan Doe XVII's experiences giving rise to the claims are thus typical of – indeed, identical to – those of other rural cooperative members. Plaintiffs allege that they are all victims of a common course of conduct by Dinant and a common course of conduct by Defendants.

26. By funding Dinant, Defendants engaged in a single course of conduct that

affected both Classes, that injured each class member, and forms the basis of all class members' claims.

**Attorney contributions to this case**

27.     For over eight years, lawyers from EarthRights International have invested considerable time and resources in order to build and litigate this case in partnership with human rights experts and community leaders in Honduras.

28.     Our legal team, which has consisted of multiple fluent Spanish-speaking U.S. lawyers, myself included, has conducted extensive factual investigations. We have completed multiple fact-finding investigations in dangerous areas of Honduras to collect documents and first-hand testimony from survivors and witnesses. We have exhaustively reviewed publicly available information regarding violence in the Bajo Aguán, and the relationships between palm oil plantations, armed groups, and financial institutions. And we have spent considerable time building trust, and engaging in ongoing and iterative consultation, with Plaintiffs and community leaders.

29.     We have also drawn upon and developed unique expertise in the legal issues presented by this case, including in particular liability for international financial institutions, transnational human rights and tort claims, class actions, and settlements aiming to achieve social and economic development outcomes for affected communities.

30.     To date, EarthRights International has recorded expenses of at least $55,276.32 on this litigation, including the precedessor D.C. action. Our co-counsel

Jose Luis Fuentes additionally recorded costs of $969.44. EarthRights attorneys do not bill clients for their time, and so we typically calculate our lodestar rates according to published tables of customary billing rates. The three tables we have consulted for this litigation are the hourly rate schedule published by Community Legal Services of Philadelphia (CLS)[1]; the *Laffey* matrix, as updated for the Legal Services portion of the Consumer Price Index[2]; and the Fitzpatrick matrix now used by the U.S. Attorney's Office for the District of Columbia.[3] The latter two are customarily used in Washington, D.C., which may be appropriate in this case given that counsel specializing in international organization immunity issues, such as EarthRights and IFC's counsel, are uniquely located in the District of Columbia.[4] Nonetheless, comparing all three tables, and billing Mr. Fuentes's time at his regular and customary rate, the lowest calculated lodestar for class counsel's time

---

[1] *Available at* https://clsphila.org/about-community-legal-services/attorney-fees/. The CLS schedule has been used in this Court, "consistent with the Court's perception of a regional market for legal services, encompassing Philadelphia, southern New Jersey, and Delaware." *Rayna P. v. Campus Cmty. Sch.*, 390 F. Supp. 3d 556, 564 (D. Del. 2019).
[2] *Available at* http://www.laffeymatrix.com/see.html. In a case where D.C. billing rates were appropriate, the Third Circuit approved use of this matrix. *Interfaith Community Organization v. Honeywell Internationa'l, Inc.*, 726 F.3d 403, 416 (3d Cir. 2013).
[3] *Available at* https://www.justice.gov/media/1221881/dl. The Fitzpatrick matrix, which is based on billing rates from 419 lawyers in 86 complex federal cases in the District of Columbia through 2020, and adjusted for inflation since then, is now the dominant standard in D.C. *See generally J.T. v. District of Columbia*, Civil Action No. 19-cv-989 (BAH), 2023 U.S. Dist. LEXIS 12271 (D.D.C. Jan. 23, 2023); *see also Brackett v. Mayorkas*, Civil Action No. 17-988 (JEB), 2023 U.S. Dist. LEXIS 139037, at *6 (D.D.C. Aug. 9, 2023) (noting both sides agreed that the Fitzpatrick Matrix was appropriate).
[4] *See Interfaith Cmty. Org.*, 726 F.3d at 413.

in this case is $1,407,721.60, using the CLS schedule. Class counsel will provide a more detailed accounting with their application for attorneys' fees.[5]

**Plaintiff Contributions to this Case**

31.    All the Plaintiffs, including the Individual Plaintiffs and the class representatives, spent a significant amount of time working with counsel in order to prepare and advance the litigation, and to reach the proposed settlement.

32.    From the beginning of the litigation, the Plaintiffs regularly participated in meetings and conference calls concerning the litigation. Participation in these meetings often required the Plaintiffs to take time off work or away from their farming or household responsibilities. Sometimes the Plaintiffs even took off multiple full days so as to be able to either travel over eight hours to be able to meet with counsel in secure locations and consult regarding settlement negotiations, or join full-day mediation sessions.

33.    Participation in this litigation has also entailed risks to physical security and mental health. Due to the long history of violence and intimidation in the region, residents of the Bajo Aguán live with constant fear of violent reprisals – including murder – for any activity seen to be at all contrary to the interests of Dinant.

34.    Indeed, as counsel were preparing to file the original lawsuit, in late 2015, one of our clients in Honduras was murdered – which we believe was done on Dinant's behalf. That murder then became part of the allegations in this case.

---

[5] Class counsel are still compiling time records from attorneys who have worked on this case. The calculation provided herein is a highly conservative figure based only on currently substantiated attorney time records.

35. Due to the pervasive security threat, all Plaintiffs have sought to participate pseudonymously in this litigation out of fear for their lives if their identities were to be disclosed. Any activity that might reveal their participation in this lawsuit – including communicating with counsel and other Plaintiffs, and participating in meetings or calls – presents both actual security risks and significant emotional stress. This has been a consistent source of fear and has created ongoing risks to their physical security. Further, in order to prepare case filings and meaningfully contribute to settlement discussions, the Plaintiffs have had to repeatedly relive traumatic experiences, exacerbating the already heightened risk of mental health challenges.

**Settlement Negotiations**

36. For over four years, since May 2019, the Parties have engaged in extensive negotiations over the content and form of a possible settlement. Negotiations started with in-person meetings in 2019 and early 2020, followed by calls and exchanges of position by letter as further in-person meetings became impossible due to the COVID-19 pandemic. From August 2021 until April 2022, the Parties participated in two full-day mediation sessions and follow-up teleconferences with Magistrate Judge Hall, helping to narrow the areas of difference and provide the outlines of a possible agreement. Following these mediation sessions, the Parties continued negotiation directly through the exchange of draft term sheets and accompanying letters until August 24, 2022, when the Parties reached an agreement in principle on the key terms of a settlement. Negotiations continued

13

over the text of the final settlement agreement and accompanying exhibits until November 2023, when counsel for all Parties agreed to the form of a settlement agreement, which was then fully executed on November 29, 2023.

37. Following Third Circuit guidance, to avoid even the appearance of collusion between counsel, Plaintiffs' counsel refrained from engaging in any negotiations over attorneys' fees until after the total settlement value was negotiated. Once an agreement in principle was reached as to the total settlement value, in order to maximize benefits for the Classes, Plaintiffs' counsel proposed setting a cap of 15% of the total settlement value for attorneys' fees, a figure well beneath even the lower end for fee recoveries in comparable cases in the Third Circuit. Later this cap was lowered to 12.45% of the total settlement at Plaintiffs' counsel's own initiative.

**Experience and Opinion of Class Counsel**

38. Class Counsel recommend the proposed settlement and believe that it is in the best interests of the members of the Classes.

39. Class Counsel reaches this recommendation drawing upon a wealth of experience. In addition to the extensive experience of Plaintiffs' counsel's legal team (representing decades of experience litigating cases seeking corporate accountability for international human rights violations), Class Counsel worked closely throughout the negotiation and mediation process with Juliana Bird, an expert on the Honduras region, and Anthony DiCaprio, an experienced human rights attorney who also serves as a professional mediator.

40. Counsel have also engaged an outside attorney with extensive class action

experience to advise on the settlement here, and have also consulted with an ethics expert to obtain additional perspective and guidance on matters that developed over the course of the negotiations and efforts to structure a reasonable, equitable, and fair settlement.

41. Class Counsel also draws on its own experience with similar community-oriented settlements in other cases and efforts to administer funds for the development of affected communities. For example, Class Counsel procured a settlement in *Carijano v. Occidental Petroleum Corp.,* a case involving the environmental and public health legacy of four decades of oil extraction near Indigenous communities in the Peruvian Amazon. In that case, EarthRights worked with Peruvian legal experts, government authorities, and foreign trustees to create and implement a settlement that involved administering a $16 million fund for community health, education, and development projects. Further, three members of Class Counsel have served on the board of an organization that similarly funds community development projects in an underserved area of rural Myanmar.

42. Based on this experience and the various positions and interests articulated by the Parties during the course of the negotiations, Plaintiffs and their counsel concluded that the settlement offer on the table was the most beneficial settlement available under the circumstances, and the choice before Plaintiffs was to accept the settlement or proceed with litigation, with all of its inherent risks. Class Counsel and the class representatives have determined that the settlement will provide meaningful and important benefits to the Classes addressing some of their most

15

pressing needs, and believe it is in the best interest of the Classes to accept.

43. The proposed process of consulting with class members regarding the projects that should be implemented with the settlement funds will ensure that the benefits of the settlement directly respond to the Classes' most pressing needs and priorities. While it is yet unknown what projects class members will endorse, it is not difficult to imagine the adoption of projects that aim to respond directly to the underlying harms suffered. Members of the Panamá Class, for example, may pursue projects related to the provision of counseling and mental health services, which would help respond to the widespread trauma experienced by the community. Similarly, members of the Farmers' Cooperative Class may pursue economic livelihood projects to help generate regular and sustainable income where they have been deprived of such opportunities due to the fraudulent appropriation of their lands.

44. The proposed settlement was carefully structured to provide the level of flexibility and class member control necessary to ensure that any projects developed are best tailored to respond to the needs and challenges of the Bajo Aguán. Reporting procedures regarding fund administration are built into the proposal, to provide this Court an ongoing opportunity to ensure the implementation of the settlement has its intended effect.

45. Current conditions facing the Classes in Honduras contribute to the conclusion that a negotiated resolution is far preferable to protracted litigation. In particular, many class members, particularly from the Farmers' Cooperative Class, are of advanced age and further protracted delay may prevent them from receiving

any benefit at all from the litigation. Indeed, our initial analysis of the Class has revealed that several class members have already died. In addition, poverty is widespread among both Classes, with class members in dire need of a variety of even basic social services, contributing to a sense of urgency to obtain positive benefits from this case. This proposed settlement promises to address some of these urgent needs.

**Appropriateness of the Notice Plan**

46. The complex realities of the Bajo Aguán make it prohibitively difficult to effectuate notice of the proposed class settlement through many common channels.

47. First, the mail service in this region of Honduras is unreliable, there is limited internet access, and e-mail correspondence is not a common mode of communication in the region.

48. Second, while there has been an increase in access to mobile phones, their use is still far from universal, there is no simple way of obtaining mobile phone numbers, and it is common practice for one mobile phone to be shared among several members of an extended family making it difficult to target communications at specific individuals.

49. Third, while there is a growing use of platforms such as Facebook and WhatsApp among people who do have smartphones and internet access, it is common for rumors and misinformation to spread widely on such platforms, at times deliberately through the manipulation of digital content. As a result, any system of notification that relies primarily on the distribution of digital content

17

carries the very real risk of manipulation and disinformation.

50. For these reasons, after consultation with advocates with extensive experience in Honduras as well as Honduran attorneys, counsel has determined that the most effective means of providing notice to the vast majority of class members is through hand-delivery of the notice forms where security conditions allow. A preliminary list of likely class members, as well as the likely locations of their residences, can be assembled by consulting public records, internal cooperative documents, and consulting with community leaders and other known class members.

51. Using this list, a reliable messenger service supervised by a trusted Honduran law firm can hand-deliver physical copies of the notice forms to likely class members, the vast majority of which are believed to be concentrated in a discrete number of communities in the region. Short interviews with class members can help identify any additional likely class members, and in this manner, the initial list can be expanded iteratively to provide notice to all likely class members.

52. The notice forms will contain a WhatsApp number that will connect potential class members to the Honduran law firm and class counsel to address any questions about the settlement and the options available. Physical copies of the full Settlement Agreement, translated into Spanish, can also be provided upon request.

53. To complement these efforts, we propose arranging radio announcements to run on three radio stations with wide listenership in the Bajo Aguán region. These radio announcements will direct class members to the same WhatsApp number that

they can contact to obtain all the information provided on the formal notice forms. A proposed script for the radio announcements is attached hereto as Exhibit 2.

54.     Additionally, we propose creating a secured website that provides access to the notice forms and other relevant case and settlement documents. This website will be password-protected, with the URL and password provided to confirmed class members on request. Restricting access through the use of password protection will help guard against the manipulation of digital documents for the purposes of disinformation.

55.     If security conditions allow, and there appears to be sufficient interest and/or need, Class Counsel may also make themselves available for an in-person meeting in Tocoa to make a presentation and address any questions about the settlement.

56.     Counsel believes that these methods are reasonably calculated to reach the highest number of class members within the constraints imposed by the conditions in the region.

**Need for continued pseudonymity**

57.     In January 2018, the Court granted Plaintiffs' October 2017 motion to proceed pseudonymously. In that motion, Plaintiffs described the longstanding and ongoing risks to their physical security of living in the most dangerous place in the world for land rights defenders. In particular, Plaintiffs described a climate of violence, led by private and public security forces aligned with Dinant (including dangerous paramilitary groups and hitmen), targeting those who in any way challenged Dinant's claims to the lands it acquired through fraud, coercion, and

violence.

58. That climate of violence gave rise to the claims at issue in this complaint and justified the use of pseudonyms when the case was filed, and that same climate of violence and threats to Plaintiffs and land rights defenders continues to this day.

59. I am prepared to offer additional evidence of this violence if necessary. Plaintiffs maintain their well-founded and already demonstrated fear to their physical security through reprisals if their association with this lawsuit were to come to light. The safest course of action is for the same protections afforded Plaintiffs in the litigation be maintained throughout the next steps in the settlement process.

I declare under penalty of perjury that everything I have stated in this document is true and correct. Signed on December 5, 2023 in Washington, District of Columbia.

/s/ Marissa Vahlsing

Marissa Vahlsing